**Opinion issued March 12, 2026**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-25-00760-CV**

———————————

## IN THE INTEREST OF F.H. AND D.K.A. A/K/A D.A., CHILDREN

———————————

**On Appeal from the 315th District Court**
**Harris County, Texas**
**Trial Court Case No. 2023-02526J**

———————————

## MEMORANDUM OPINION

The Department of Family and Protective Services sought to terminate the parental rights of T.A. (Mother) and B.H. (Father) to their minor daughter F.H. (Faith) and their minor son D.K.A. *a/k/a* D.A. (David).[1] Following a bench trial, the

---

[1]  In this opinion, we use pseudonyms for the minor children and their family members to protect their privacy. *See* TEX. R. APP. P. 9.8(b)(2).

trial court found that two statutory predicate grounds justifying termination of Mother's parental rights existed and that termination of her rights was in the children's best interest. *See* TEX. FAM. CODE § 161.001(b)(1)(E), (O), (b)(2).[2] Although the court found that the same two predicate grounds justified termination of Father's parental rights, the court also found that termination of his rights was not in the children's best interest. The court terminated Mother's parental rights to Faith and David, appointed the Department as the children's sole managing conservator, and appointed Father as the children's possessory conservator.

In two issues on appeal, Mother contends that the Department failed to present factually sufficient evidence to support (1) the trial court's finding under subsection (E) and (2) the trial court's finding that termination of her parental rights was in the children's best interest.

We affirm.

## Background

Mother has four children: an adult daughter (Sharon); a minor daughter born in 2009 (Andrea); Faith, who was born in 2010; and David, who was born in 2013. Only Mother's parental rights to Faith and David are at issue in this proceeding.

---

[2] As discussed later in this opinion, the Texas Legislature amended Family Code section 161.001(b)(1) in the 2025 legislative session. All citations to section 161.001(b) in this opinion are to the version in effect at the time the trial court signed the final decree.

Mother and Father have not been involved in a romantic relationship for several years.

## A. The Department Becomes Involved with the Family and Allegations Leading to this Proceeding

The Department received two referrals concerning Mother and her children prior to Faith's birth in 2010. In 2007, Mother's oldest daughter Sharon reported that she was afraid of Mother because Mother "whopped" her and would hit her on her back and arm, sometimes leaving bruises. Mother admitted drinking alcohol and using marijuana. She was "never home," sent Sharon "to school with the same dress and shirt on for a week," and "never washed" Sharon's clothes. The allegations in this referral were "ruled out" after Mother passed a drug test. In 2009, both Mother and her second daughter Andrea tested positive for marijuana when Andrea was born. The Department had "reason to believe that abuse occurred."

From 2011 through 2022, the Department received seven referrals, some of which included allegations of physical abuse or neglect. Six of the seven referrals were "ruled out" or had a disposition of "unable to determine." The remaining referral concerned an allegation of neglectful supervision in January 2014. Mother left her three youngest children (including David, who was an infant) unattended in her car while she went into a store to get milk. Mother "stated they were unattended for 5 minutes," and she reported that "where she used to live she had left the children alone before" and it "was not that big of a deal." Law enforcement officers saw her

3

"come out of the store with milk." The children were "in good condition" with no visible marks or bruises, and Mother "did not appear intoxicated." Officers did not file charges against Mother.

Father's criminal history includes a 2017 charge for driving while intoxicated with Faith in the car. Faith was seven years old at the time of this offense. Father pleaded guilty. At trial, Father disputed that he was intoxicated while driving with Faith, stating instead that he had empty cans in the back of his truck and marijuana on him. He admitted that he pleaded guilty to another DWI charge in 2022.[3] Mother agreed that driving under the influence with a child in the car was unsafe, but she did not "recall [Father] driving under the influence."

In July 2023, law enforcement officers arrested Mother after she allegedly disciplined Faith by hitting her with a belt. She was subsequently charged with injury to a child under fifteen years old, a third-degree felony offense. Mother was released on bond, but she was not allowed to have contact with Faith as part of the conditions of her pretrial release. Due to these conditions, Faith and David lived with Father and his girlfriend. The criminal charge arising out of this incident was later dismissed.

---

[3]    At the July 2025 trial setting, Father agreed with the children's ad litem attorney that he had "picked up another DWI in the last week." He did not believe that he had a problem with substance abuse. Additionally, he did not intend to stop smoking marijuana, which he characterized as "not a drug."

Faith and David were still staying with Father in November 2023. The Department and law enforcement received calls alleging that during an argument with the children, Father punched ten-year-old David in the face, leaving a "ball size" bruise on his right cheek. When the Department and police investigated, David reported that Father was physically abusive to him and Faith and that "the police have been to his mother's house because she tries to abuse his sister." Father was aggressive and belligerent. He denied abusing the children and characterized the allegations as lies.

Faith spoke with her aunt on the phone, and at her aunt's urging, she reported that she was the one who scratched David's face. Father's girlfriend "was heard telling the child [Faith] this is not your fault this is your brother's fault because he is lying." After consulting with the District Attorney's Office, law enforcement officers arrested Father, and he was charged with injury to a child. Father's girlfriend "started yelling and screaming at the children to get their stuff they have to leave." Other family members arrived at Father's house, but none of them were willing to care for the children, calling David a "lying child" and stating that both children were "nothing but trouble" and "nobody wants them."

With Mother unavailable[4] and no other family members willing to take the children, the Department removed the children from Father's care. The Department investigator took the children to the hospital. David had a bruise on his face, and he told the nurse that "his father did [it] by punching him and kicking him in the face." When asked whether Father hit him often, David replied, "yes my father always beats me." Other than David's bruised face, the children had no injuries. The injury to a child charge against Father was later dismissed after it was determined that Faith—not Father—hit David and left the bruise on his cheek.

The Department sought temporary managing conservatorship over Faith and David, sole managing conservatorship over the children if they could not be reunited safely with Mother and Father, and, alternatively, termination of both Mother's and Father's parental rights to the children. The Department created a family plan of service for both parents. According to Mother's service plan, the Department had two primary concerns:

- The Department "is worried that due to allegations of past physical abuse [of Faith] by [Mother] that both children may end up seriously abused and severely injured."[5]

---

[4] The Department investigator repeatedly tried to contact Mother while at Father's house. Law enforcement informed the investigator that four months earlier, Mother had been arrested and charged with assault for physically abusing Faith. The officer "stated a restraining order was set in place by the court system that the mother was not to have any contact with the child."

[5] The service plan included statements from Mother relating to disciplining the children. Mother informed the Department caseworker that "normally she doesn't

6

- The Department "is worried that [Mother] may not be able to control her anger and [may] seriously injure one or both of the children."

The service plan required Mother to complete parenting classes, complete a drug and alcohol assessment, participate in random drug testing, complete a psychosocial assessment and follow all recommendations, complete individual and family counseling, and complete a psychiatric and psychological evaluation.

## B.     Trial Testimony and Evidence

A bench trial occurred over four days in April, May, June, and July 2025. At the time trial started, Faith was fourteen years old, and David was eleven years old, but by the time the trial court signed the final decree in August 2025, both children had had their next birthdays. The children were not living together: Faith resided in a residential treatment center, and David resided in a foster home. Neither placement was an adoptive placement.

Mother completed some, but not all, of the tasks required by her service plan. She completed a psychological assessment but did not follow the recommendations from that assessment. She also completed a substance-abuse assessment, but she did not complete any outpatient substance abuse therapy, nor did she consistently participate in random drug testing as requested by the Department. Mother did not

believe in hitting her kids," but with Faith "you have to put your hands on her because she wants to do the most." Mother disciplined David by "tak[ing] stuff away from him."

7

provide proof that she completed individual counseling or parenting classes. She also did not provide proof of income or proof of stable housing.

Child Advocates representative Rosa Branch viewed Mother's apartment in March 2025, shortly before trial began. Branch did not believe the apartment was appropriate for two children: the home smelled like cigarettes and marijuana; numerous ashtrays were located around the apartment; Mother had tools for rolling cigarettes in a closet; and the apartment was dirty and cluttered, with clothes lying everywhere and "a lot of alcohol bottles laying around." Mother lived in this apartment with Sharon and fifteen-year-old Andrea. Mother also threatened Branch by stating that if Branch ever showed up to Mother's house again, she "will see what happens next."

Mother testified during the June 2025 trial date and stated that although she still lived in the apartment that Branch had visited three months earlier, she was in the process of moving because she had just purchased a house in Houston. She also testified that she planned on relocating to Louisiana, and she had not decided whether she would stay in Houston.

During both her psychological assessment and her substance abuse assessment, Mother reported that she began using marijuana in high school, but "the last time she used was last year." At trial, Mother acknowledged that she currently used marijuana, which helped alleviate back pain and migraines. She did not have a

prescription for medical marijuana. The trial court admitted three recent drug test results for Mother:[6]

    (1)    In January 2024, her urine tested negative for all substances, but her hair tested positive for marijuana;

    (2)    In April 2024, her urine tested positive for alcohol, but her hair tested negative for all substances; and

    (3)    In April 2025, her hair tested positive for marijuana and cocaine, and her urine tested positive for alcohol and negative for all other substances.

Mother testified that she had never used cocaine and could not explain the positive result for that substance, speculating that perhaps Tylenol or her migraine medication led to that result.

One of the Department's primary concerns relating to the children was Mother's parenting skills, particularly how she disciplined the children. Mother testified that when the children frustrate her or do not listen to her, she disciplines them by taking things away. But she also acknowledged using corporal punishment: "[I]f they are being unruly, or if [Faith] is trying to hit on her other sisters or brothers or hit them entirely too hard, yeah, she will get a whooping." Mother uses a belt when "whooping" Faith "on her behind," and in the incident that led to Mother's

---

[6]    The trial court also admitted evidence that Mother did not appear for random drug testing on at least two occasions in July 2024 and October 2024. A permanency report filed by the Department with the trial court in March 2025 reflected that Mother failed to appear for drug testing on twelve occasions.

July 2023 arrest, Faith "probably got a little welt or two on her leg." She denied hitting David in the same manner.

Mother testified that Faith's behavioral problems began when she was one or two years old, and the problems increased when she was four or five. Mother explained that she began using corporal punishment early in Faith's school years:

> It started when [Faith] started getting in trouble in school all the time, and I would ask [Father] to come over, try to talk to her or deal with her, but it was, like, "Oh, she will be okay."

> And it started getting worse when she started trying to fight with teachers and then she started trying to fight on adults. That is when [Faith] started getting whoopings, when she started feeling like she is going to be the mother and not the daughter.

In addition to physical discipline, Mother tried talking to Faith and restricting TV and phone usage. "[S]ometimes she would do okay for a few days, and then it's right back to cutting up."

Mother testified that her parents used corporal punishment with her when she was growing up. She believed that whoopings were appropriate to give misbehaving children starting around ages five to seven. When asked when she believed this form of discipline was no longer appropriate for children, Mother replied, "I don't know the age that's appropriate for them not to get a whooping." As a hypothetical, the children's ad litem attorney asked Mother whether she would give Sharon, who was twenty-three, a whooping if she "was disrespectful to you at this age." Mother responded that she would.

Father testified that he had never "used excessive force" to discipline Faith or David. He had witnessed Faith physically "act out" towards David, and he intervened by separating them. He did not believe that Mother's use of corporal punishment was appropriate. He testified that David had told him about Mother's physical discipline of Faith, and when Father tried to talk to Mother about that, Mother would not let him see the children. Father did not have any concerns with the children being around Mother, but he was also not interested in trying to co-parent with her.

The Department presented evidence that both Faith and David have some special health and educational needs. Faith has been diagnosed with ADHD, has "emotional mood swings," and has issues with depression and anxiety.[7] She receives "special instructions" while at school to help her complete tasks. She has a good relationship with both a school counselor and staff at her residential treatment facility, and they help her "de-escalate" and "refocus" when she gets distracted or emotional. Faith requires a "specialized" level of care, and she receives trauma-

---

[7] A permanency report that the Department filed with the trial court in January 2025 stated that "[b]ehaviorally, [Faith] is reactive but does not demonstrate a clinical level of behavioral involvement. She angers quickly but is redirectable by staff." The report further noted that Faith had several different placements throughout the case, and on three occasions the change in placement was necessitated by Faith's behavioral issues and aggression. The report also stated that Faith was "developmentally typical but demonstrates difficulty with academic material," and she reported that "school is very hard for her" and that she "missed 'a lot of school' when she was moving from home to home." Faith's medication included anti-anxiety medication and mood stabilizers.

focused individual therapy and therapy relating to adjustment disorder. Department caseworkers believed that the residential treatment center was meeting Faith's emotional needs because the environment was very structured and provided needed stability for her.

David has a medical condition that caused him not to have regular bowel movements, and he also has difficulty staying awake during the school day. A Department permanency report stated that David had been diagnosed with "Autism Spectrum, ADHD combined type," and he took medications to treat ADHD and "irritability associated with autistic disorder." He receives special attention from teachers during classes, and he also has special education accommodations "if he starts becoming frustrated, overemotional, or upset." David has also been diagnosed with adjustment disorder, and he receives trauma-focused individual therapy to assist with that diagnosis. Child Advocates volunteer Jesse Escobedo testified that David's "whole demeanor has kind of changed significantly" since he had been in foster care. Although he was still quiet and reserved, "he does light up when he talks about certain things, gets excited," and his interaction with classmates and caregivers "has also improved quite significantly." Escobedo believed that a "structured, stable environment" was important for David.

Mother had visitations with the children during the pendency of the case. During one visit, she started talking to David about the case, telling him that the

Department was trying to pit her and Father against each other and "make them look like bad parents," and then she told the children that she was moving to Louisiana. During the most recent visit, she told Faith that Faith "was the reason why they were in this whole mess," which made Faith leave the visit early. Mother later explained to the caseworker what she meant by her statement:

> She stated that the children need to be taught a lesson. They want to go live with their Dad so bad, she is going to let them go live with their Dad. She is tired of what's been going on with the case. She wouldn't even be in this mess if it wasn't for [Faith] acting too grown, and [Mother] just stated—repeated over and over again, the children need to be taught a lesson. She doesn't care how they feel.

Faith told Escobedo that she "didn't want to actually proceed with having visits with" Mother.

Mother told her caseworker that she was frustrated and stressed in dealing with the case. She also stated that "if she has to sign her rights away, she will"; she "wants to teach the children a lesson"; if the children "don't want to live with her, they can be with their father, and they can just end up back in CPS care again next year"; and she "was going to take her two oldest children [Sharon and Andrea] and move to Louisiana and leave the other children [Faith and David] here." She told the caseworker, "I don't care. I can just have another kid."[8] Faith and David both wanted

---

[8] Mother disputed this testimony, although she agreed that she did not have any concerns about the children remaining with Father and that she might have told the caseworker that she could not deal with the case anymore and that Father could have

13

to live with Father, and they also wanted to stay together. Escobedo agreed that Faith had indicated that "she, at this time, really wants nothing to do with her mother."

Both the Department and Child Advocates recommended termination of Mother's and Father's parental rights. The caseworkers were concerned about substance abuse and the ability of the parents to maintain stable housing and income. They believed that both children needed a stable home so they could receive consistent therapy and have their educational and medical needs met. Specifically with respect to Mother, one of the caseworkers was concerned about Mother's "[p]arenting skills, continued substance abuse, no stability in the home, structure or job, [and] not being able to meet education requirements, emotional support and requirements." The caseworker believed that both parents had delayed working on the services required by their service plans and "are scrambling at the last moment to complete services." The parents would not drug test for the Department, and they were "not very forthcoming with information." The caseworker believed that it would not "be best for the children to return home."

## C. The Trial Court's Termination Decree

Following trial, the trial court signed a final decree concerning Mother's and Father's parental rights to the children. In this decree, the court found by clear and

---

the children. Mother further testified that she loves Faith and David and wants to continue having a relationship with them.

14

convincing evidence that both Mother and Father violated two statutory predicate grounds for termination: subsection (E) and subsection (O).[9] *See* TEX. FAM. CODE § 161.001(b)(1)(E), (O). Although the court further found that termination of Mother's parental rights was in Faith and David's best interest, it found that termination of Father's rights was not in the children's best interest. The court appointed the Department as the children's sole managing conservator and Father as the children's possessory conservator.

Mother appealed the termination decree. Father is not a party to this appeal.

---

[9]      At the time of the final decree, subsection (O) provided that a court could terminate a parent's rights if it found by clear and convincing evidence that the parent "failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of [the Department] for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child." *See* Act of May 24, 2005, 79th Leg., R.S., ch. 508, § 2, sec. 161.001(b)(1), 2005 Tex. Gen. Laws 1395, 1396 (amended 2025). In the 2025 legislative session, the Texas Legislature removed this provision as a predicate ground that can support termination of a parent's rights and renamed the remaining predicate grounds. *See* Act of May 14, 2025, 89th Leg., R.S., ch. 211, H.B. 116, § 2 (to be codified as an amendment to TEX. FAM. CODE § 161.001(b)(1)). This amendment became effective on September 1, 2025, and "applies to a suit affecting the parent-child relationship that is pending in a trial court on the effective date of this Act or that is filed on or after the effective date of this Act." *See id.* §§ 3–4. The trial court signed the final decree in this case on August 29, 2025, three days before the amendment became effective, and it continued to sign orders well after the effective date. Hence, the suit remained "pending" in the trial court on the effective date. Subsection (O) thus ceased to operate as a basis for termination and requires no discussion here.

## Sufficiency of Evidence

Mother raises two issues on appeal. She first argues that factually insufficient evidence supports the trial court's finding under subsection (E). She then argues that factually insufficient evidence supports the finding that termination of her parental rights is in Faith and David's best interest.

### A.     Standard of Review

To terminate a parent's rights to her minor children, the factfinder must find by clear and convincing evidence that (1) at least one statutory predicate ground for termination exists, and (2) termination of parental rights is in the children's best interest. *In re C.E.*, 687 S.W.3d 304, 308 (Tex. 2024) (per curiam). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007.

When reviewing the termination findings for factual sufficiency, we weigh disputed evidence contrary to the finding against all evidence favoring the finding. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). We must determine whether the disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding. *Id.* Evidence is factually insufficient if, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that the factfinder could not have formed a firm

belief or conviction that the finding was true. *Id.* If we reverse a termination decree for factual insufficiency, we must detail why we have "concluded that a reasonable factfinder could not have credited disputed evidence in favor of the finding." *In re J.F.C.*, 96 S.W.3d 256, 266–67 (Tex. 2002).

The "high evidentiary burden" mandated at trial requires a "heightened standard of review" on appeal, but we must still defer to the factfinder, which heard the witnesses and evaluated their credibility. *In re J.F.-G.*, 627 S.W.3d 304, 311–12 (Tex. 2021) (quotation omitted). The factfinder resolves conflicts in the testimony, weighs evidence and witness credibility, and draws reasonable inferences from the evidence that it chooses to believe. *In re C.E.*, 687 S.W.3d at 308–09. We may not substitute our judgment for that of the factfinder. *Id.* at 309.

Only one statutory predicate ground and a best interest finding are necessary to support a judgment for termination of parental rights. *In re M.P.*, 639 S.W.3d 700, 702 (Tex. 2022) (per curiam). But termination based on subsection (E) can form the basis to terminate a parent's rights to another child. TEX. FAM. CODE § 161.001(b)(1)(M); *In re N.G.*, 577 S.W.3d 230, 234 (Tex. 2019) (per curiam). Even if sufficient evidence supports another predicate ground, we must review a finding under subsection (E) when challenged by a parent. *In re N.G.*, 577 S.W.3d at 235 (stating that appellate court's failure to review challenged subsection (E) finding "deprives the parent of a meaningful appeal and eliminates the parent's only

17

chance for review of a finding that will be binding as to parental rights to other children").

**B.      Endangerment Finding**

The trial court may order termination of a parent's rights if the court finds by clear and convincing evidence that the parent engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child. TEX. FAM. CODE § 161.001(b)(1)(E).

As used in subsection (E), "endanger" means to expose a child to loss or injury or to jeopardize the child. *In re R.R.A.*, 687 S.W.3d 269, 277 (Tex. 2024) (quoting *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). A parent's endangering conduct does not have to be directed at the child, nor must the child actually suffer injury. *Id.* (quoting *Boyd*, 727 S.W.2d at 533). The factfinder may infer endangerment from a course of conduct that presents substantial risks to the child's physical or emotional well-being. *Id.* (quotation omitted). These risks "can be developed by circumstances arising from and surrounding a parent's behavior," but the risks "must be more than 'a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment.'" *Id.* (quoting *Boyd*, 727 S.W.2d at 533).

Subsection (E) requires more than a single act or omission to justify termination. *In re R.R.*, 711 S.W.3d 126, 139 (Tex. App.—Houston [1st Dist.] 2024,

no pet.). Instead, the evidence must demonstrate a "voluntary, deliberate, and conscious course of conduct by the parent." *Id.* We may consider the parent's actions before the child's birth "while the parent had custody of older children." *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). We may also consider conduct that occurred after the Department removed the child from the parent's care. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

A factfinder may reasonably find endangerment based on "a pattern of parental behavior that presents a substantial risk of harm to the child." *In re R.R.A.*, 687 S.W.3d at 278. This parental behavior can include substance abuse and its effect on the parent's life and the ability to parent. *In re J.O.A.*, 283 S.W.3d at 345. "[E]ndangerment does not require a parent's drug use to directly harm the child." *In re R.R.A.*, 687 S.W.3d at 278. Although illegal drug use by itself "may not be sufficient to show endangerment, a pattern of drug use accompanied by circumstances that indicate related dangers to the child can establish a substantial *risk* of harm." *Id.* We must not evaluate evidence of parental drug use in isolation but must also consider "evidence that a factfinder could reasonably credit that demonstrates that illegal drug use presents a risk to the parent's 'ability to parent.'" *Id.* (quoting *In re J.O.A.*, 283 S.W.3d at 345).

We may also consider a parent's criminal history. A parent's imprisonment, standing alone, does not constitute endangerment. *In re J.F.-G.*, 627 S.W.3d at 312–

19

13. However, it may support an endangerment finding "if the evidence, including the imprisonment, shows a course of conduct which has the effect of endangering the physical or emotional well-being of the child." *Id.* at 313 (quoting *Boyd*, 727 S.W.2d at 534). Relevant considerations include the nature of the parent's crimes, the duration of incarceration, and whether a pattern of escalating, repeated convictions exists. *Id.*

Abusive or violent conduct by a parent can create a home environment that endangers a child's well-being. *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.). Courts may consider whether a parent uses corporal punishment to discipline a child, and relevant evidence includes the regularity and severity of the punishment. *In re J.A.J.*, 225 S.W.3d 621, 630–31 (Tex. App.—Houston [14th Dist.] 2006) (op. on reh'g), *rev'd in part on other grounds*, 243 S.W.3d 611 (Tex. 2007); *see* Tex. Fam. Code § 151.001(e)(1) (providing that parent may use corporal punishment "for the reasonable discipline of a child"); Tex. Penal Code § 9.61(a) (providing that use of force by parent against child is justified "when and to the degree the actor reasonably believes the force is necessary to discipline the child or to safeguard or promote his welfare"). Courts have held that infrequent spankings "that leave 'marks' or visible bruises 24 hours after the spanking do not constitute sufficient evidence" of endangerment. *See In re A.S.*, 261 S.W.3d 76, 88 (Tex. App.—Houston [14th Dist.] 2008, pet. denied).

In arguing that factually sufficient evidence supports the trial court's finding under subsection (E), the Department relies on two broad categories of evidence: (1) Mother's drug use, and (2) Mother's "aggression, violence, and instability." We address both categories in turn.

With respect to drug use, Mother candidly acknowledged that she had a history of using marijuana. During her psychological evaluation, which occurred in May 2024, Mother stated that she began smoking marijuana in middle school, and "in high school her smoking increased to 10-20 blunts every day." According to Mother's CPS history included in the removal affidavit that accompanied the Department's original petition, both Mother and Andrea tested positive for marijuana at Andrea's birth in July 2009. Mother admitted that she had used marijuana during that pregnancy. Mother also tested positive for marijuana while she was pregnant with David in 2013 "but denied using drugs in the presence of her children." The Department did not take action following this incident because Mother was "currently working services through Cradles." The record also contains evidence that Mother tested positive for marijuana in May 2017. During her psychological evaluation, Mother "voiced a history of completing multiple substance abuse treatments due to prior CPS involvement."

While Mother was on pretrial release for the injury to a child charge involving Faith, she admitted to her release supervisor during an October 2023 meeting that

she had used marijuana in violation of her pretrial release conditions. Several months later, Mother told the psychological assessment evaluator that she "stopped smoking last year." At trial, however, Mother agreed that she currently used marijuana, explaining that she used it to cope with back pain and migraines, although she did not have a prescription for medical marijuana. When Mother testified in June 2025, she estimated that she smoked marijuana approximately once a month, and the last time she smoked was "[a]bout a month or two ago." The record contains two positive drug test results for marijuana: in January 2024 and April 2025, Mother's hair sample tested positive. Mother did not participate in random drug testing on twelve different occasions during the pendency of the case.

The April 2025 drug test results also revealed that Mother's hair sample tested positive for cocaine. This is the only positive drug test for an illicit substance other than marijuana in the record. Mother denied using cocaine. She was aware of the positive test result but did not have an explanation, stating, "I have no idea. I have not used cocaine, nor have I ever used cocaine." Mother speculated that the positive result may have come from Tylenol or her migraine medication, which might be "an amphetamine medication."

The Department argues that this evidence supports the trial court's endangerment finding, emphasizing Mother's drug usage during the pendency of the termination proceeding. This behavior violated the requirements of her service plan

and occurred while her parental rights were in jeopardy. *See In re K.A.C.*, 594 S.W.3d 364, 373 (Tex. App.—El Paso 2019, no pet.) ("[E]vidence that the parent continued to use illegal drugs even though the parent knew her parental rights were in jeopardy is conduct showing a voluntary, deliberate, and conscious course of conduct, which by its nature, endangers a child's well-being."). Mother's refusal to submit to drug testing on multiple occasions throughout the case also permits a factfinder to infer that she refused testing because she knew the result would be positive. *See In re J.M.T.*, 519 S.W.3d 258, 269 (Tex. App.—Houston [1st Dist.] 2017, pet. denied). The Department also argues that Mother was not forthcoming about the extent of her drug usage, and the trial court as the factfinder could have reasonably disbelieved her testimony relating to cocaine usage. *See In re E.D.*, 682 S.W.3d 595, 610 (Tex. App.—Houston [1st Dist.] 2023, pet. denied) ("A parent's continuing use of illegal drugs combined with a lack of candor about her continuing use poses a risk to a child's wellbeing."); *In re S.C.F.*, 522 S.W.3d 693, 703 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (stating that trial court could have credited "the lab reports over the father's denials and claim of a 'false test'").

Mother argues that the drug test results should not be viewed in isolation, noting that the results do not contradict her trial testimony that she was only an occasional user of marijuana. She also argues that the Department did not prove that her drug use "constituted a clinically significant drug problem," pointing out that

23

there was no evidence that she was ever intoxicated while caring for the children, that she used marijuana in the children's presence, that she left the children with people who use drugs, or that she was ever arrested for drug possession. Although she did test positive for marijuana at Andrea's birth, she argues that the test result was sixteen years before trial and should not be considered sufficient evidence of endangerment.

Mother also argues that with the exception of one positive drug test for cocaine—a drug that she denied ever using—her drug history consisted solely of using marijuana, and the legal landscape concerning use of that drug has shifted dramatically over recent years. She argues that marijuana usage should not be considered in the same light as usage of drugs like methamphetamine or fentanyl. *See, e.g.*, *In re A.J.D.-J.*, 667 S.W.3d 813, 826 (Tex. App.—Houston [1st Dist.] 2023, no pet.) (stating that factfinder could have determined that parent's ongoing drug use was "of a more serious nature due to a positive test result showing the use of multiple drugs, including hard ones like methamphetamine"); *In re M.A.J.*, 612 S.W.3d 398, 415–16 (Tex. App.—Houston [1st Dist.] 2020, pet. denied) (op. on reh'g) (concluding, in best-interest analysis, that parent's drug use weighed only slightly in favor of termination when parent "tested positive for marijuana use at times during the pendency of the case," but sole positive drug test result for "hard drugs"—amphetamine and methamphetamine—occurred one year before trial).

The second category of evidence that the Department focuses on is evidence that Mother "maintained a pattern of neglect, violence, and inappropriate/illegal conduct." This category includes evidence that:

- In 2014, Mother left her three youngest children (including infant David) alone in a car while she bought milk at a store, and this was something that she did "regularly where she resided at before and it was not that big of a deal."

- Mother engaged in "fire-setting behaviors" towards a former romantic partner.

- The evidence was inconsistent concerning where and with whom Mother's four children lived throughout the years, and there was some evidence that the children lived with other relatives and that Mother only visited infrequently.

- At the time of Father's arrest in November 2023 for allegedly injuring David, David reported to the Department investigator that "the police have been to his mother's house because she tries to abuse his sister."

- During her psychological evaluation, Mother "expressed she began engaging in aggressive behaviors (i.e., fighting) during her childhood until two years ago" and "verbalized she has a history of engaging in aggressive behaviors (i.e., verbal and physical altercations) that began during her childhood." She also "disclosed a history of homicidal ideation on 'multiple occasions' when 'someone does something to fault her' (i.e., ex partners, children)," but she "denied a history of having any homicidal plans and/or attempts."

- Mother did not comply with multiple requirements of her service plan.

- Mother told a Department caseworker, "I don't care. I can just have another kid," and she also told the caseworker that she "couldn't do the case anymore" and she planned to move to Louisiana with her oldest two children (Sharon and Andrea) and leave her younger children (Faith and David) behind in Houston.

- During a visit, Mother told Faith that Faith "was the reason why they were in this whole mess." When asked by the caseworker about that

25

statement, Mother "stated that the children need to be taught a lesson"; if "[t]hey want to go live with their Dad so bad, she is going to let them go live with their Dad"; she was "tired of what's been going on with the case"; and she "doesn't care how [the children] feel."

The Department argues that this evidence "confirms a pattern of neglectful and inappropriate behaviors by [Mother] as a parent over many years, establishing she maintained a course of conduct endangering to her children."

Mother acknowledged using physical discipline on Faith. Although the July 2023 injury to a child charge was ultimately dismissed, Mother agreed that she engaged in the actions leading to that charge: "I didn't beat her, but I did whoop her." As a result, Faith "probably got a little welt or two on her leg." She stated that that incident "was the first time [Faith] got a whooping like that, but [Faith] has also had other whippings." Mother used a belt, and Faith "normally gets hit on her behind."

Mother testified that Faith had had behavioral problems since she was a small child. She started giving Faith "whoopings" when Faith started elementary school and "started getting in trouble in school all the time."[10] Faith "started trying to fight with teachers and then she started trying to fight on adults," and Mother began giving Faith whoopings "when [Faith] started feeling like she is going to be the mother and not the daughter." Mother never gave David or Andrea whoopings, although

---

[10]     Mother testified that she was around the same age when her parents started giving her whippings, and she agreed that it was "[f]or the same reasons."

sometimes Sharon got whoopings when she was a child. Mother believed that age five to seven was an appropriate age to begin whoopings for a misbehaving child, and she did not "know the age that's appropriate for [children] not to get a whooping." When asked hypothetically if she would give twenty-three-year-old Sharon a whooping if she was disrespectful to Mother, Mother replied that she would. Father did not believe this was an appropriate method of discipline.

The record contains no evidence concerning how frequently Mother "whooped" Faith. And aside from Mother's testimony that Faith "probably got a little welt or two on her leg" following the July 2023 incident, there is no evidence concerning any injuries Faith may have received from the whoopings.[11] A parent may use corporal punishment for the "reasonable discipline" of a child. *See* TEX. FAM. CODE § 151.001(e)(1); *In re A.S.*, 261 S.W.3d at 88 ("[I]nfrequent spankings of a child that leave 'marks' or visible bruises 24 hours after the spanking do not constitute sufficient evidence to demonstrate that a parent has engaged in conduct that endangered a child's physical or emotional well-being."). In some cases, spanking with a belt that leads to injuries to the child can be evidence that supports an endangerment finding. *See, e.g.*, *In re L.W.*, No. 01-18-01025-CV, 2019 WL

---

[11] Father's service plan reflects that he told a Department caseworker that Mother "gave [Faith] a [b]lack eye and he had to go get the children around July of 2023." When asked about this statement at trial, Father replied, "I'm not going to speak on that," and he could not recall if he made that statement.

27

1523124, at *11 (Tex. App.—Houston [1st Dist.] Apr. 9, 2019, pet. denied) (mem. op.) (considering, among other evidence supporting endangerment finding, testimony that mother physically disciplined children by closing door to bathroom so they could not escape, "'whoop[ing]' them with a belt for fifteen minutes at a time," stopping only when children began to scream, and leaving visible marks on children).

The Department also argues that Mother endangered the children by leaving them with Father after her July 2023 arrest "even though he had a repeated history of DWIs and committed one of those offenses with a child [Faith] in the car." It argues that it was reasonable to assume Mother knew of Father's DWI history. It further points to the condition of Mother's home during the visits by Child Advocates in March 2025: the apartment was dirty and cluttered; it smelled like cigarettes and marijuana; Mother had materials used for rolling cigarettes; numerous alcohol bottles were lying around the house; and Mother threatened Branch, the Child Advocates coordinator, by stating that if Branch ever showed up to Mother's house again, she "will see what happens next." Finally, the Department points to the past referrals it had received concerning Mother, some of which contained allegations of physical abuse. For example, in a 2018 referral, one of Mother's children "disclosed that [Mother] hits her so hard it makes her teeth hurt," and while she lived with her grandparents, she was "worried if mother gets custody, she will

28

be abusive with her." This referral was "Ruled Out," in part because the children lived with their grandparents, the incident "with [Mother] hitting the child was 6 months ago," and Mother did not "have current access to the child."

Mother points out that at trial, she testified that she did not recall Father being arrested for driving while intoxicated with Faith in the car, and it was unreasonable to infer that she did know about this criminal history. She also argues that it was inequitable for the Department to "Rule Out" allegations of physical abuse or neglect and then, years later, use the allegations in the referrals as evidence justifying an endangerment finding.

The trial court found by clear and convincing evidence that Mother engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the children's physical or emotional well-being. *See* TEX. FAM. CODE § 161.001(b)(1)(E). Considering the trial evidence in a neutral light, we conclude that the disputed evidence that the trial court could not have credited in favor of its subsection (E) finding was not so significant that the court could not have formed a firm belief or conviction that the finding was true. *See In re A.C.*, 560 S.W.3d at 631. We therefore conclude that factually sufficient evidence supports the trial court's finding under subsection (E).

## C.      Best Interest Finding

In addition to proving a statutory predicate ground for termination, the Department must also prove by clear and convincing evidence that termination of the parent's rights is in the children's best interest. TEX. FAM. CODE § 161.001(b)(2). A "strong presumption" exists that keeping children with their parent serves the children's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). Courts also presume that "the prompt and permanent placement of the child in a safe environment" is in the child's best interest. TEX. FAM. CODE § 263.307(a).

The best interest inquiry is "child-centered and focuses on the child's well-being, safety, and development." *In re J.W.*, 645 S.W.3d 726, 746 (Tex. 2022) (quoting *In re A.C.*, 560 S.W.3d at 631). When conducting this inquiry, we consider several nonexclusive factors, including:

- The desires of the child;

- The child's emotional and physical needs now and in the future;

- The emotional and physical danger to the child now and in the future;

- The parenting abilities of the individuals seeking custody;

- The programs available to assist those individuals to promote the child's best interest;

- The plans for the child by those individuals or by the agency seeking custody;

- The stability of the home or proposed placement;

- The parent's acts or omissions that may indicate the existing parent-child relationship is improper; and

- Any excuse for the parent's acts or omissions.

*Id.* (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)). We may also consider the factors set out in Family Code section 263.307, which the court should consider "in determining whether the child's parents are willing and able to provide the child with a safe environment." TEX. FAM. CODE § 263.307(b) (listing thirteen factors including "the magnitude, frequency, and circumstances of the harm to the child" and "the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time"); *In re A.C.*, 560 S.W.3d at 631 n.29.

Even if the Department proves acts or omissions relating to a predicate ground for termination, the Department still must prove that termination is in the child's best interest, although "the same evidence may be probative of both" inquiries. *In re A.C.*, 560 S.W.3d at 631–32. The factfinder may infer that past conduct endangering the child's well-being "may recur in the future if the child is returned to the parent." *In re D.M.*, 452 S.W.3d 462, 471 (Tex. App.—San Antonio 2014, no pet.). The Department is not required to prove all the *Holley* factors as a condition precedent to termination of a parent's rights. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002).

Neither fifteen-year-old Faith nor twelve-year-old David testified at trial. However, Child Advocates representatives and Department caseworkers testified

31

that both children wanted to live together, and they wanted to live with Father. Faith indicated that she "really wants nothing to do with her mother." During a visitation, Mother told Faith that she was "the reason why they were in this whole mess," which caused Faith to leave the visit early. Faith told Child Advocates volunteer Escobedo that she did not want to have visits with Mother. With respect to David and his desires, Escobedo agreed that David was a "people-pleaser." He wanted to maintain a relationship with Father, and he really wanted to live with Faith.

Mother testified that Faith had had behavioral problems since she was a small child. Early in elementary school, Mother began giving Faith "whoopings" with a belt "on her behind" to discipline her. This method of discipline continued until Faith was almost thirteen. Mother was arrested and charged with injury to a child after physically disciplining Faith in July 2023, although this charge was later dismissed. Mother believed that this was an appropriate method of discipline. When asked whether she would use this method even if her oldest daughter, who was twenty-three, disrespected her, Mother replied that she would. Father did not believe that this was an appropriate way to discipline the children.

Both Faith and David have mental health concerns: they both have been diagnosed with adjustment disorder, and they both take medication to treat ADHD. Faith also takes medication to treat anxiety and depression. They both receive some special education accommodations. Trial evidence demonstrated that Faith has a

history of behavioral problems, including aggressive behavior that affected her placements throughout the case. Mother was aware of Faith's ADHD diagnosis and her "anger issues." She "[n]ever really understood why [Faith] would lash out when she would lash out," but she knew that Faith was seeing a counselor who she "can talk to about what is causing a problem," and the counselor would "help her calm down a little bit."

At the time of trial, Faith resided in a residential treatment facility, and David resided in a foster home. Faith enjoyed living at the facility. The staff was aware of her mood swings, and they were "able to de-escalate and keep her on track." She had bonded with "a lot of the individuals, or the workers, who help her and know how to help her when she does become a [little bit] emotional." Faith receives trauma-focused individual therapy and "therapy focused on the adjustment disorder." Faith's behavior had improved while at the facility: she was consistently going to school, her grades had improved, "she was getting assistance to try to get all of her classes passing scores," she received therapy at the facility, and facility staff helped with her social needs by taking her "on activities out in the community." She was no longer shy at school; instead, she had friends and positive interactions with her classmates.

David's behavior had also improved during the case. He received special attention from teachers at school and trauma-based individual therapy, and Escobedo believed that David had benefitted as a result. His demeanor had changed

"significantly": although David was still quiet and reserved, "at the same time he does light up when he talks about certain things, gets excited." His interactions with his peers and classmates had also improved.

Caseworkers and Child Advocates believed that stability and structure were of paramount importance for both children. Specifically, both children needed to continue receiving the therapy that they had begun, and Faith, in particular, needed a "nurturing home where limits are clear" because that kind of environment had been crucial to her behavioral improvement. Escobedo was concerned that the children had been in multiple schools, and he believed that they needed "some sort of educational surrogate" to "advocate for their educational needs."

Child Advocates and the Department were concerned that Mother could not provide the stability and structure that the children needed to build upon their educational and behavioral improvements. Mother's housing situation was uncertain: she had moved out of her apartment after purportedly buying a house in Houston, but she was also considering moving to Louisiana. Child Advocates and caseworkers were also concerned about Mother's commitment to emotionally supporting the children and attending to their therapeutic needs. Mother had not completed her own individual counseling, nor had she completed parenting classes.[12]

---

[12] With respect to other tasks required by her service plan, Mother did not consistently participate in random drug tests (and when she did, she tested positive for marijuana

At one point, Mother told her caseworker "that she was moving to Louisiana, that she couldn't do the case anymore and that she was going to take her two oldest children [Sharon and Andrea] and move to Louisiana and leave the other children [Faith and David] here." Mother expressed frustration with the case and told the caseworker that she "wants to teach the children a lesson." She further stated, "I don't care. I can just have another kid." Mother denied making this statement.

Weighing against the trial court's best interest finding is evidence that neither Faith nor David were in an adoptive placement, and they did not live together. Faith lived in a residential treatment facility, and David lived in a foster home. Although David's foster family was willing to keep him longer, they did not wish to adopt him. The Department had explored the possibility of placing Faith and David together with their older sister Sharon, but it concluded that this was not a viable possibility: Sharon sometimes lived with Mother, she did not have stable housing, she was only twenty-three, and she was pregnant. The Department believed that caring for Faith and David under these circumstances would be too stressful for Sharon.

Moreover, the trial court did not terminate Father's parental rights. It named the Department sole managing conservator for the children and named Father as

_____

twice and positive for cocaine once), and she did not complete any outpatient substance abuse therapy.

possessory conservator.[13] The children therefore could not live with Father (as they desired), but they also could not be adopted even if a placement was available because Father retained his parental rights. *See id.* at 28 (stating that evidence concerning placement plans and adoption is relevant to best interest, but "lack of evidence about definitive plans for permanent placement and adoption cannot be the dispositive factor"); *In re L.G.R.*, 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) ("A child's need for permanence through the establishment of a stable, permanent home has been recognized as the paramount consideration in a best-interest determination.") (quotation omitted).

Mother expressed her frustration with the proceeding and testified that she hoped she and Father could "keep [their] children" and "put this behind" them. She stated that she loved her children, and she disagreed with any suggestion that she did not "want to be bothered" with the children. She testified that the process of completing services had been difficult, and she had received conflicting information concerning the need to complete services. She also believed that through her individual counseling, she had learned new parenting techniques that could help her correct Faith's behavioral issues. Mother did not have a problem with the children

---

[13]     The termination decree stated that Father "shall have possession of the children at times mutually agreed to in advance by the parties, and in absence of agreement, according to standard Texas Department of Family and Protective Services policies and guidelines."

living with Father rather than her, but she wanted to maintain a relationship with the children.

The evidence relating to the best interest of the children was conflicting. But considering the evidence in a neutral light, the conflicts in the evidence were not so significant that the trial court could not have formed a firm belief or conviction that termination of Mother's parental rights was in the best interest of Faith and David. *See In re A.C.*, 560 S.W.3d at 631. We therefore hold that factually sufficient evidence supports the trial court's finding on best interest.

We overrule Mother's two appellate issues.

## Conclusion

The trial court faced conflicting evidence and could have resolved the conflicts in either side's favor. Given the state of the record, we have no basis for disturbing the trial court's decision. We affirm the trial court's decree terminating Mother's parental rights to Faith and David.


David Gunn
Justice

Panel consists of Chief Justice Adams and Justices Gunn and Johnson.